*United States v. Curry*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 21st day of November, two thousand twenty-three.

PRESENT:

> JOHN M. WALKER, JR.,
> REENA RAGGI,
> RICHARD J. SULLIVAN,
> *Circuit Judges*.

———————————————————————

UNITED STATES OF AMERICA,

> *Appellee*,

> v.                                                                     No. 22-50

DALVON CURRY, a.k.a. DALE, a.k.a. DALO,

> *Defendant-Appellant*.[*]

———————————————————————

---

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

**For Defendant-Appellant:**        ANDREW H. FREIFELD, New York, NY.

**For Appellee:**        MONICA J. RICHARDS, Assistant United States Attorney, *for* Trini E. Ross, United States Attorney for the Western District of New York, Buffalo, NY.

Appeal from a judgment of the United States District Court for the Western District of New York (Lawrence J. Vilardo, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the December 22, 2021 judgment of the district court is **AFFIRMED**.

Dalvon Curry appeals from his judgment of conviction following a jury trial in which he was convicted of nine counts stemming from his involvement in the "Cash Been Long"/"Brothers for Life" ("CBL/BFL") gang, including one count of racketeering conspiracy (Count One); one count of narcotics conspiracy (Count Two); one count of possession of firearms in furtherance of a drug-trafficking crime (Count Three); two counts of murder in aid of racketeering activity (Counts Four and Seven); two counts of discharge of a firearm in furtherance of a crime of violence (Counts Five and Eight); and two counts of discharge of a firearm causing death in furtherance of a crime of violence (Counts Six and Nine). Following the

jury's verdict, Curry moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33. The district court denied Curry's posttrial motions and sentenced him to a statutorily mandated term of life imprisonment on each of Counts Four and Seven, to run concurrent with a sentence of 300 months on each of Counts One and Two and to be followed by consecutive terms of 60 months on Count Three and 120 months on each of Counts Six and Nine, for a total aggregate term of life plus 300 months.

On appeal, Curry asserts that he is entitled to judgments of acquittal on all counts except for Count One, as to which he nonetheless challenges the special factor findings relevant to that count.[1] With regard to those counts related to the shooting of Jacquan Sullivan – namely, Counts Four, Six, and Special Factor Two under Count One (the "Sullivan Counts") – Curry argues that the district court erroneously charged the jury on three exceptions to Curry's justification defense. As to the remaining counts (concerning the shooting of Xaiver Wimes and the CBL/BFL narcotics conspiracy), Curry argues that the government's evidence was

---

[1] In entering judgment, the district court dismissed Counts Five and Eight as lesser included offenses of Counts Six and Nine, respectively. Curry accordingly does not advance any arguments pertaining to Counts Five or Eight on appeal.

legally insufficient to prove the requisite elements of each offense. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

## I. Sullivan Counts

Curry argues that judgments of acquittal are warranted on the Sullivan Counts because the district court erred in instructing the jury as to three instances in which the defense of justification is not available – namely, when the defendant was the initial aggressor, when the defendant could have safely retreated but failed to do so, and when the defendant engaged in illegal combat by agreement. Curry asserts that the record evidence was insufficient to justify any of the three challenged instructions, that the combat-by-agreement instruction was legally deficient, and that the government otherwise failed to carry its burden of disproving Curry's justification defense.[2]

We review preserved claims of error in jury instructions *de novo*, "reversing only where, viewing the charge as a whole, there was a prejudicial error." *United*

---

[2] At various points in his briefing, Curry criticizes the government for purportedly making deceptive statements before the jury. Curry does not, however, assert a claim of prosecutorial misconduct or request any relief in connection with the government's purported bad faith. We therefore do not consider any such issue to have been properly presented on appeal. *See Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009).

4

*States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) (internal quotation marks omitted). Where such a claim is unpreserved, we review solely for plain error. *See United States v. Miller*, 954 F.3d 551, 557–58 (2d Cir. 2020); Fed. R. Crim. P. 52(b). To prevail on plain-error review, an appellant must demonstrate that the error "is clear or obvious," "affected the appellant's substantial rights," and "seriously affects the fairness, integrity[,] or public reputation of judicial proceedings." *United States v. McCrimon*, 788 F.3d 75, 78 (2d Cir. 2015) (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)).

Curry concedes that he did not object to the initial-aggressor or failure-to-retreat instructions before the district court, such that plain-error review applies. Curry did, however, object to the combat-by-agreement instruction. We therefore review that instruction *de novo*.

We begin with Curry's argument that the evidence presented at trial was insufficient to warrant the initial-aggressor instruction. "Because the law pertaining to self-defense is a matter of federal common law," we "look to state court decisions for guidance" in evaluating whether it was appropriately charged. *United States v. Desinor*, 525 F.3d 193, 199 (2d Cir. 2008); *see also United States v. Melhuish*, 6 F.4th 380, 396–97 (2d Cir. 2021). Under New York law, "a defendant

5

is justified in using 'deadly physical force' upon another only if that defendant 'reasonably believes that such other person is using or about to use deadly physical force.'" *People v. Brown*, 33 N.Y.3d 316, 320 (2019) (quoting N.Y. Penal Law § 35.15(2)). This justification defense is not available, however, "if [a] defendant is the 'initial aggressor'" – *i.e.*, "the first person in an altercation who uses or threatens the imminent use of deadly physical force." *Id.* at 320–21 (quoting N.Y. Penal Law § 35.15(1)(b)).

Here, we cannot say that the district court committed plain error in instructing the jury as to the initial-aggressor exception to justification. A witness testified that gunshots came from "the people on the porch" of the house where Curry was temporarily staying, while the individual on the street simply ran away. App'x at 676. Another witness testified that Curry told him how, upon seeing Sullivan's car drive past the porch, Curry walked *towards* the car, pulled out his gun before Sullivan could reach his, and continued to shoot even as Sullivan ran away. In light of this evidence, the district court was wholly justified in giving the initial-aggressor instruction. The fact that other evidence may have allowed Curry to argue that he was not the initial aggressor did not preclude an instruction advising the jury as to this exception to justification. *Cf. Harris v.*

6

*O'Hare*, 770 F.3d 224, 238 n.9 (2d Cir. 2014) ("All that a party needs to show is that there is some evidence supporting the theory behind the instruction so that a question of fact may be presented to the jury." (internal quotation marks omitted)).

We turn next to Curry's argument that there was insufficient evidence to justify the failure-to-retreat instruction. New York law prohibits an individual from "us[ing] deadly physical force if he knows that he can with complete safety . . . avoid the necessity of doing so by retreating." *Matter of Y.K.*, 87 N.Y.2d 430, 433 (1996) (internal quotation marks omitted). Thus, if a defendant faced with deadly physical force knows he can safely retreat and fails to do so, the justification defense "is lost." *Id.* at 434.

Again, the district court did not plainly err in giving the failure-to-retreat instruction. As noted above, there was sufficient evidence to support a finding that Curry walked *towards*, rather than away from, Sullivan when he saw him drive by. And, given the evidence indicating that Curry was on the porch of a house when the encounter began (as well as the lack of any evidence suggesting that the house was locked), a reasonable juror could have concluded that Curry was capable of retreating inside the house to avoid the encounter.

Finally, we turn to Curry's challenges to the district court's combat-by-agreement instruction, which Curry claims was both inadequately supported by the record and legally insufficient.

As an initial matter, we discern no error in the content of the district court's combat-by-agreement instruction, which was entirely consistent with New York law. *Compare* App'x at 2437, *with* N.Y. Penal Law § 35.15(1)(c), *and* N.Y. Crim. Jury Instructions, Penal Law § 35.15(2) (2d ed.).

Turning next to Curry's challenge to the evidentiary basis for the instruction, New York law is clear that a justification defense is negated when the "physical force involved is the product of a combat by agreement not specifically authorized by law." N.Y. Penal Law § 35.15(1)(c). New York courts have held that the combat-by-agreement exception to the justification defense "is generally limited to agreements to combat between specific individuals or small groups on discrete occasions." *People v. Anderson*, 180 A.D.3d 923, 924 (2d Dep't 2020), *aff'd*, 36 N.Y.3d 1109 (2021). Nevertheless, "[a]n agreement to engage in combat not authorized by law" need not be express and may be "a tacit agreement." *People v. Agosto*, 203 A.D.3d 841, 842 (2d Dep't 2022). For example, a combat-by-agreement instruction may be warranted where "there [is] evidence to support a

8

conclusion that [the] defendant and the victim were members of 'rival groups that tacitly agreed, pursuant to an unwritten code of macho honor, that there would be mutual combat.'" *People v. Young*, 33 A.D.3d 1120, 1124 (3d Dep't 2006) (alterations omitted) (quoting *People v. Russell*, 91 N.Y.2d 280, 288 (1998)); *see also People v. Rosario*, 292 A.D.2d 324, 325 (1st Dep't 2002) (upholding combat-by-agreement instruction when "there was adequate proof to establish that defendant and his opponent had tacitly agreed to engage in a gun battle").

Here, contrary to Curry's suggestion, the government's evidence demonstrated more than a generic rivalry between local gangs. *Cf. Anderson*, 180 A.D.3d at 923 (concluding that there was insufficient evidence to support a combat-by-agreement charge when the record only contained "generalized evidence that the defendant was a member of a gang which had a rivalry with other local gangs"). The government introduced exchanges on social media between Sullivan and Curry, including an exchange approximately one week before the shooting, in which the two traded insults and threatened in-person altercations at specific locations, as well as evidence suggesting that each was aware that the other was in possession of firearms.

Having determined that the district court did not err as to any of the challenged jury instructions, we reject Curry's claim that he is entitled to judgments of acquittal or a new trial on the Sullivan Counts.

## II. Wimes Counts

We next address Curry's argument that the evidence was insufficient to sustain his convictions in connection with the fatal shooting of Xavier Wimes – Counts Seven, Nine, and Special Factor Three under Count One (the "Wimes Counts") – because the government failed to establish that Curry shot Wimes in order to maintain or increase his position in CBL/BFL.

We review *de novo* the district court's denial of a motion challenging the sufficiency of the evidence pursuant to Federal Rule of Criminal Procedure 29, *see United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021), and must decide whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. White*, 7 F.4th 90, 98 (2d Cir. 2021) (explaining that a reviewing court must "credit[] every inference that could have been drawn in the government's favor, and defer[] to the jury's assessment of witness credibility and its assessment of the

weight of the evidence" (internal quotation marks omitted)).   A defendant challenging the sufficiency of the evidence "bears a heavy burden," as this standard of review is "exceedingly deferential."   *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (internal quotation marks omitted).

For a defendant to be convicted of a violent crime in aid of racketeering, the government must prove, among other things, that the defendant committed the alleged crime of violence in order "to maintain or increase his position in the [racketeering] enterprise."   *White*, 7 F.4th at 101 (internal quotation marks omitted).   A defendant's desire to maintain or increase his position need not be his "sole or principal motive" in order for this element to be satisfied.   *Id.* (internal quotation marks omitted).   Instead, the jury need only be able to "properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership."   *Id.* (internal quotation marks omitted).

Here, we agree with the district court that the government offered sufficient evidence for a rational juror to conclude that Curry killed Wimes, at least in part, to preserve his position in CBL/BFL.   The government introduced evidence demonstrating that violent acts were celebrated by CBL/BFL members, that such

11

acts were necessary to maintain CBL/BFL's status, and that Curry himself recognized the importance of these violent acts to a member's status in the gang. More specifically, the evidence showed that, earlier on the day of the shooting, Curry and Wimes engaged in a Facebook exchange in which Curry insulted Wimes's cousin, a rival gang member who was killed, and questioned Wimes's loyalty to CBL/BFL. The evidence also demonstrated that, after Wimes hit Curry in the head with a bottle in front of his fellow CBL/BFL members, a fellow CBL/BFL member threatened that Wimes was not going to "leav[e] [the] building alive," App'x at 428, and that at least some CBL/BFL members interpreted Wimes's attack on Curry as him "taking up" for a rival gang, *id.* at 1571, 1575.

What is more, the record reflects that, within one month of the Wimes shooting, Curry posted on Facebook that someone had "tr[ied] to take [his] life[,]" so he was "supposed to shoot," and that he "put in that work[,] that's how [he] blew up," alongside an emoji of a smiley face wearing sunglasses. *Id.* at 2529. At trial, witnesses explained that "putting in work" meant "[r]ob[bing], steal[ing], kill[ing], shoot[ing] [or fighting] somebody" for the benefit of the gang. *Id.* at 785; *see also id.* at 1405 (explaining that the term "putting in work" was used to describe gang-related shootings). Based on this evidence, we cannot say that no

12

reasonable trier of fact could have determined that Curry killed Wimes in order to maintain or increase his position in CBL/BFL.

## III.    Narcotics Counts

As to the remaining counts related to the CBL/BFL narcotics conspiracy – Counts Two, Three, and Special Factors 1.b and 1.c under Count One (the "Narcotics Counts") – Curry contends that the government failed to demonstrate the existence of a conspiracy or his membership in it.

To affirm a conviction for narcotics conspiracy, the record must permit a rational jury to find "(1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the defendant intentionally joined the conspiracy."   *United States v. Barret*, 848 F.3d 524, 534 (2d Cir. 2017) (internal quotation marks omitted).   With regard to the knowledge element, a defendant need not know "all of the details of the conspiracy, so long as he knew its general nature and extent."   *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (internal quotation marks omitted).

Curry claims that he must be acquitted on the Narcotics Counts because the government failed to prove that members of CBL/BFL who sold drugs participated in a criminal conspiracy, as opposed to merely acting as "independent contractors

13

vis-à-vis each other." Curry Br. at 56. Curry additionally argues that, even if the government did prove the existence of the narcotics conspiracy, the government failed to demonstrate that Curry joined it simply by virtue of being a "shooter who called himself BFL." *Id.* at 57. Neither of these contentions has merit.

Curry himself concedes that CBL/BFL members engaged in daily sales of marijuana, heroin, crack, and fentanyl at the same location in the Towne Gardens Plaza. And the evidence at trial amply demonstrated that gang members cooperated with one another to sell drugs, including by alerting each other to the presence of police and by hiding and sharing firearms to protect their territory. Moreover, trial testimony confirmed that individuals played different roles in CBL/BFL – while some were "killers" and "shooter[s]" to keep the gang and its territory protected, others were tasked with earning money for the gang by dealing drugs. App'x at 1092–93; *see also id.* at 813–23 (explaining how CBL/BFL members protected and encouraged the drug-dealing activities at Towne Gardens).

Here, the record indicates that Curry was aware of CBL/BFL's participation in drug trafficking, took actions to protect the gang and its territory where drug dealing occurred, and even sold drugs himself. We therefore reject Curry's contention that the evidence was insufficient to support the Narcotics Counts.

14

\*     \*     \*

We have considered Curry's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court